2025 IL App (3d) 230227

Opinion filed May 1, 2025

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2025

| | | |
|---|---|---|
| *In re* ESTATE OF HAROLD E. SIPPEL, | ) | Appeal from the Circuit Court |
| | ) | of the 21st Judicial Circuit, |
| Deceased | ) | Kankakee County, Illinois, |
| | ) | |
| (Harold L. Sippel and Kevin Sippel, | ) | |
| | ) | |
| Petitioners-Appellants, | ) | Appeal No. 3-23-0227 |
| | ) | Circuit No. 16-P-250 |
| v. | ) | |
| | ) | |
| HomeStar Bank and Financial Services, n/k/a | ) | Honorable |
| Midland States Bank, | ) | Ronald J. Gerts |
| | ) | Nancy A. Nicholson, |
| Respondent-Appellee). | ) | Judges, Presiding. |

_____

JUSTICE DAVENPORT delivered the judgment of the court, with opinion.
Justice Hettel concurred in the judgment and opinion.
Justice Peterson concurred in part and dissented in part, with opinion.

_____

**OPINION**

¶ 1     This appeal arises out of a dispute over a bank trustee's management of a decedent's trust.
Petitioners, Harold L. Sippel and Kevin Sippel, appeal the denial of their petition to remove
respondent, HomeStar Bank and Financial Services, n/k/a Midland States Bank (bank), from its
trusteeship over the trust of decedent, Harold E. Sippel. For the reasons that follow, we affirm the
denial of the petition to remove and remand with directions.

¶ 2                              I. BACKGROUND

¶ 3        In 2003, decedent created a revocable living trust. In 2014, he amended the trust to name his four children—Kevin Sippel, Richard Sippel, Debra Kroll, and Harold L. Sippel (collectively, the siblings)—as cotrustees upon his death. During life, decedent and his wife, Winnie Sippel (who predeceased him), were the 100% owners of S&S Heating and Sheet Metal (S&S), and they owned its primary building on 4th Avenue in Kankakee. The siblings were all involved in S&S. Decedent died on December 8, 2015, and S&S ceased all operations around that time. Decedent was survived by the siblings, who are heirs and legatees under his estate plan, each to receive a ¼ share of the residual assets. The assets in his estate were to pour over into the trust.

¶ 4        In February 2016, after disagreements arose between petitioners and Richard and Debra, all four siblings resigned as cotrustees. Their resignation instrument appointed the bank as successor trustee.

¶ 5        In October 2016, petitioners filed a three-count petition contesting decedent's will and trust. Count I alleged Debra and Richard unduly influenced decedent, count II alleged decedent was of unsound mind in the nearly 21 months before his death, and count III—"Petition to Remove [the Bank] as Trustee"—alleged the bank negligently sold trust assets and assisted in Debra and Richard's fraud against petitioners. In February 2017, the trial court allowed for discovery on count III and dismissed counts I and II without prejudice.

¶ 6                     A. Count III—Petition to Remove the Bank as Trustee

¶ 7        Count III alleged the bank (1) met secretly with and was biased in favor of Debra and Richard; (2) destroyed S&S records and permitted the destruction or removal of S&S's computer to conceal Debra and Richard's fraudulent activity; (3) refused to book or acknowledge a $68,000 liability on S&S's records in favor of the siblings; (4) was in the process of selling S&S's primary

2

building for approximately half its value, "including giving away approximately $47,500 in business equipment to the purchaser"; (5) sold three S&S vehicles at "giveaway prices" and sold decedent's boat for $12,000, knowing the boat had recently been repaired at a cost of $30,000; (6) failed to disclose, before accepting trusteeship, a conflict of interest stemming from its creditor status on a $50,000 mortgage on S&S's primary building; and (7) failed to disclose, before accepting trusteeship, that decedent's $100,000 life insurance policy, originally payable directly to the siblings, was assigned to the trust at the bank's insistence to secure S&S's indebtedness to the bank and to other creditors.

¶ 8    Count III asked the court to (1) remove the bank from its role as trustee of decedent's trust, (2) appoint a special administrator to distribute assets and settle the estate, and (3) compel the bank to account for the pecuniary losses it caused, the records it destroyed, and "its activities in assisting the fraud on petitioners by Debra Kroll and Richard Sippel."

¶ 9    After nearly two years of discovery, the third count proceeded to a six-day bench trial that began in January 2019 and concluded in March 2021. During this time, the parties filed various motions and conducted supplemental discovery. At trial, the court heard the testimony of Harold and Debra. The court also heard the testimony of the bank's trust officer, the bank's accounting expert, petitioners' corporate tax expert, and two real estate brokers.

¶ 10                    B. Trial Testimony

¶ 11                    1. *Jacklene Bruhn*

¶ 12    Jacklene Bruhn, the bank's trust officer, testified as an adverse witness in January and February 2019 and as the bank's witness in March 2021. She was the bank's trust officer from 2015 to 2020. During this time, she reported to the bank's trust committee. The committee, which consisted of four bank executives, made all decisions on sales of any asset that was not a security.

3

¶ 13 In February 2016, attorney Robert LaBeau—who Bruhn believes represented the trust—asked if the bank would consider becoming the trust's successor trustee. Later that month, she met Debra for the first time in LaBeau's office. Richard was also there, but petitioners were not. Bruhn did not know any of the trust's beneficiaries before then. Debra informed her that the bank had previously given decedent and his late wife a line of credit collateralized by S&S's primary building. On March 1, 2016, the bank assumed successor trusteeship.

¶ 14 Bruhn worked toward paying off S&S creditors and liquidating its assets. Her first task as trustee was to gather information on the trust assets. Those assets included S&S's primary building and a neighboring apartment in Kankakee, as well as a building in Cabery. She set up two accounts: one for the trust and one for S&S. She closed two of decedent's bank accounts containing $27,393 and $4,363, depositing those balances into the trust. The trust received approximately $130,000 in life insurance proceeds. S&S was no longer operational when the bank took over.

¶ 15 For the primary building, she obtained a "date-of-death" appraisal from Douglas Anderson, valuing the property at $165,000. However, this appraisal relied on "comparable sales" outside Kankakee County. She also recalls, vaguely, an earlier $300,000 appraisal that she was not involved with. She sought opinions from local commercial realtors Joseph Nugent and Jeff Bennett. After walking through the building, Nugent advised its value was closer to $100,000. The building's assessment value was $101,000. Bennett drove by the building and opined the assessor seemed to have the property accurately valued at $100,000. Neither expressed an interest in listing the property; they did not feel they could sell it in a reasonable amount of time due to the market.

¶ 16 Bruhn emphasized she did not make decisions unilaterally. She presented the trust committee with the building's valuations and annual cost of property tax and insurance ($15,800 per year). A prospective buyer withdrew in early 2016, but a second buyer made an offer in the

4

fall of 2016. The property sold for $128,000—$91,000 for the building and $36,800 for the inventory. The trust committee reviewed all relevant facts and made the final decision to approve the sale. Proceeds paid off a $49,362 line of credit with the bank.

¶ 17     The trust contained a 1974 houseboat that had previously been listed for $19,900. No appraisal was conducted on it. The bank accepted a $14,000 offer for the houseboat; $2,000 went toward a commission. The trust would have incurred a $5,000 storage fee had the boat not been sold at that time.

¶ 18     The bank contracted with an accounting firm to prepare S&S's tax returns. According to the 2015 year-end tax return, S&S had $83,917 in trade payables. Bruhn negotiated with the trade creditors, and they agreed to settle for "90 cents on the dollar." She paid $61,759 to settle S&S's debts to the trade creditors. In her January 2019 testimony, Bruhn acknowledged S&S's 2015 tax return indicated shareholder loans of $118,000, but she could not answer why those loans were not paid off because she did not know the shareholders' identity. In her February 2019 testimony, she testified the bank did not repay any of the shareholder loans because the shareholders were decedent and his late wife, who "would just be paying themselves back." Later in her testimony, she stated the shareholder loans were written off. When asked to explain what that meant, Bruhn acknowledged she did not know and suggested asking the accountant who prepared the tax return.

¶ 19                                    2. *Debra Kroll*

¶ 20     Debra testified in February 2019. She worked at S&S from 1978 to 2015. She handled invoicing, mail, phones, and accounts payable. S&S used QuickBooks for daily bookkeeping, and Harold would help with computer issues. Raymond Busch, an outside accountant, managed S&S's financial records. Each month, Debra sent Busch company records, and he returned a financial statement book covering payables, receivables, and payroll. After decedent's passing, Debra and

her brothers met at attorney LaBeau's office, then went to the S&S office, where she gave her brothers lists of company bills and assets. At the S&S office, the four siblings decided they would not be able to work together as cotrustees of the trust. (Debra testified these meetings took place in January 2015; however, decedent died in December 2015, and so these meetings likely occurred in January 2016.)

¶ 21 When the bank became trustee, Debra provided Bruhn lists of S&S bills and assets. In November 2016, she gave Bruhn the financial statement books prepared by Busch.

¶ 22 S&S had a $50,000 line of credit from the bank, backed by the company's primary building and personally guaranteed by her parents. Debra acknowledged the S&S tax return for the period ending in June 2017 listed $168,680 under "Loans from Shareholders." That amount came from money her parents put into the company over "40-some years," not from the line of credit.

¶ 23 After a 2014 accident and mild stroke, decedent moved in with her. No doctor diagnosed him with dementia. He stayed with her for 20 months until his death. Debra stopped office work in November 2015 to care for decedent.

¶ 24 Her mother's life insurance proceeds went into decedent's bank account, which was "listed as a trust." Decedent used the money to pay his personal bills. The attorney who drafted the trust advised that life insurance should properly go to the trust, not directly to the siblings. Debra noted the trust says all bills are to be paid before anything goes to the siblings. In October 2015, the Cabery home sold for around $64,000 to $67,000. The sale proceeds went into decedent's account and were used for bills and union payments at S&S. None of it went to her.

¶ 25 S&S was a union shop, with steep monthly pension, health, and welfare costs for her three brothers. S&S's tax return ending in June 2015 listed $96,834 for "pension/profit-sharing." This amount went to the sheet metal workers' union. Debra was not in a union, so she received no

6

pension. In 2008, after a $30,000 money judgment was entered against S&S, the four siblings had to decide between shutting down S&S and keeping it going. They chose to keep it going. All four siblings went to the bank and obtained a line of credit collateralized by a rental home they owned. Between 2008 and 2011, Sippel Rentals, the siblings' rental company, transferred over $60,000 to S&S. This money was not a loan; "[i]t was giving." All four siblings agreed the money would go toward union dues and to keep S&S going.

¶ 26    Decedent's bank account held $66,000 around October 2015. In late 2015, $37,600 went from that account into S&S to cover union obligations. That amount was booked as part of the $168,000 shareholder loan. Debra did not take money for herself. After the bank took over as trustee, she had no further role in property sales or distributions. No bankruptcy filing for S&S was ever made to her knowledge. Her parents "would never, never go into bankruptcy. They were very proud people to pay their bills." No distributions from the trust had been made to her or Richard.

¶ 27    At one point during Debra's testimony, the following dialogue transpired:

> "THE COURT: And as far as—and—and as far as this—this business about payables to the shareholders, didn't Jackie Bruhn testify that—that the debts were paid off at about 90 percent?
>
> [PETITIONERS' COUNSEL]: They paid nothing to the shareholders.
>
> [BANK'S COUNSEL]: There's—there's no—
>
> THE COURT: That's not what I asked you. Would you get on the topic I'm talking about?
>
> [PETITIONERS' COUNSEL]: 90 percent, yes.

THE COURT: Okay. Good. Why didn't they pay 100 percent? Well, they would pay 100 percent of their money because the shareholders have—first—I'm sorry. The—the creditors have first claim on the money, not the shareholders."

¶ 28                                    3. *Harold L. Sippel*

¶ 29        Harold testified in June 2019 and was cross-examined in March 2021. Decedent had a serious car accident in April 2014. After the accident, decedent never returned to his Cabery home and often appeared confused. Decedent passed away in December 2015 at 84 years old. After decedent's death, financial irregularities surfaced involving S&S and family assets. Several checks drawn from the siblings' line of credit never appeared in S&S's books. Decedent's rental income disappeared, and key business records went missing. Debra and Richard refused to give petitioners access to any business records.

¶ 30        Attorney LaBeau advised Harold that resigning as trustee would allow Harold to gain access to S&S's business records. Harold and his siblings signed a document appointing the bank to serve in their place. By this time, most of decedent's assets had already shifted into the trust, leaving the probate estate nominal. Petitioners had not been invited to a "secret meeting" with Bruhn that was attended by Debra, Richard, and attorney LaBeau before the bank became trustee.

¶ 31        Harold and Kevin met with Bruhn in early March 2016. At this meeting, Harold asked Bruhn whether Debra had submitted certain S&S liabilities involving checks, signed by Debra, drawn from a line of credit secured by a mortgage on rental property owned by the siblings. Bruhn said she did not. Harold asked her about S&S's records. Bruhn failed to produce any information and failed to acknowledge decedent's missing rental income. Harold asked her where S&S's computers were, but she did not know and said she would not "chase after a computer." Bruhn

also stated, either at the meeting or at a later meeting, that if Harold wished to do something about the unrecorded liabilities, he would need to retain an attorney.

¶ 32 Harold reviewed bank statements for decedent's checking account from October to November 2015. The account began the period with a balance of $66,687 and ended with $13,946. Decedent was bedridden at the time, and Harold knew of no significant expenses or medical bills warranting the large withdrawals. No accounting explained the large withdrawals or the location of the missing funds, and the bank offered no clear answer for these discrepancies.

¶ 33 Harold learned the siblings were no longer decedent's life insurance beneficiaries after a 2015 amendment had assigned beneficiary status to the trust. He believed this amendment was fraudulent because he did not believe decedent knew what he was signing at the time it was made. He recognized, however, that the trust provisions allowed such transfers.

¶ 34 The bank placed life insurance proceeds directly into the trust and sold the S&S building for $91,200, despite prior appraisals reaching $350,000. The bank sold decedent's 48-foot houseboat for $12,000, yet no documentation showed any formal appraisal or attempts to find a higher bid. Decedent purchased the boat for about $80,000 in the 1990s, and the boat had recently undergone about $30,000 in repairs.

¶ 35 Harold noted S&S's final corporate tax return reflected $168,680 in "loans to shareholders." Decedent and his wife were S&S's two shareholders. No distributions were made to the siblings, who were the shareholders' heirs, to satisfy this liability.

¶ 36                                     4. *Jerry Kinnan*

¶ 37 In March 2021, Jerry Kinnan testified as petitioners' corporate tax expert. He reviewed S&S's final corporate tax return for the period ending June 30, 2017. The balance sheet showed negative retained earnings and a $213,771 net operating loss (NOL) carryforward. Under the

Internal Revenue Code of 1986 (Code) (26 U.S.C. § 1 *et seq.* (2012)), a NOL can have significant value if a profitable entity acquires a loss corporation or merges in a manner that meets federal requirements. S&S's ending NOL could have been valuable to an acquiring corporation because it was a way "to offset profits *** in future years." Specifically, the NOL could have been worth around $60,000 at the current 21% tax rate or more than $90,000 if the rate rose to 37%. Kinnan opined the bank should have tried to leverage the NOL by selling S&S to a buyer seeking NOL benefits. According to him, "a tax loss can be acquired in a variety of manners properly and utilized on an ongoing basis subject to the limitation in [section] 382(b)" of the Code (26 U.S.C. § 382(b) (2012)). And while a substantial change in ownership triggers limits on NOL use under section 382 of the Code (26 U.S.C. § 382 (2012)), transactions exist—such as liquidations under sections 332 and 381 of the Code (26 U.S.C. §§ 332, 381 (2012))—that can preserve the utility of NOL carryforwards. Kinnan provided hypotheticals and used the Sears-Kmart merger to explain different ways an acquiring company could take advantage of a NOL carryforward. He opined that section 269 of the Code (26 U.S.C. § 269 (2012)), which disallows tax benefits from acquisitions made to evade or avoid income tax, does not override the other sections of the Code.

¶ 38                                    5. *Michael Pakter*

¶ 39          Michael Pakter testified in March 2021 as the bank's accounting expert. In his view, Kinnan's opinions regarding the NOL were incorrect and entirely speculative. The NOL was worthless because S&S was unmarketable and lacked sustainable operations. Under section 269 of the Code (*id.*), an acquirer must have a valid business purpose for acquiring S&S beyond the NOL; otherwise, it risks losing the NOL. Here, there would be no purpose for acquiring S&S "other than this hypothetical buyer buying this hypothetical loss." Based on S&S's balance sheets and income statements, the company consistently struggled to cover core expenses and relied on

10

shareholder loans to stay afloat. Pakter conducted a market study and determined there were likely no buyers interested in a distressed, low-tech company in Kankakee, particularly one burdened by declining revenues, hazardous-material risks, and limited growth prospects.

¶ 40                                6. *Joseph Nugent*

¶ 41        Joseph Nugent, a real estate broker, testified in March 2021 as to the value of S&S's primary building. In June 2016, he met with Bruhn at the building to give a broker's opinion of value. He toured the building with his partner and found it to be about a century old, zoned residential, yet used industrially in a largely residential area. The building had limited parking, low ceilings, and no modern loading facilities, all of which hindered marketing. Because the building is a legal nonconforming use, a new owner would likely need a rezoning or variance, a process that could take at least three months and that could face opposition from neighboring residents. The fair market value for a quick sale was around $100,000, in line with sale prices of other older industrial properties. The higher appraisals of $165,000 and $300,000 were unrealistic. Due to the building's age and use, there was a likelihood of asbestos or hydraulic oil from old machinery, the removal of which is costly.

¶ 42                                7. *Jeff Bennett*

¶ 43        Jeff Bennett, a real estate agent, testified in March 2021 about his valuation of S&S's primary building. When Bruhn asked him to determine a reasonable listing price for the building, he teamed up with a colleague to examine local records, drive by the building, and review assessor data. He noticed the building was zoned residential, making industrial operations a legal nonconforming use that could complicate a sale. Parking was limited, and the property likely needed a city variance or conditional use permit for continued industrial operations. Any attempt to convert or demolish the structure for residential development would be speculative, given

11

Kankakee's market and the extensive costs involved. He suggested a listing price around $100,000, consistent with the tax assessor's valuation.

¶ 44                                           C. Close of Evidence

¶ 45       At the close of evidence, the trial court set oral closing arguments for May 2021. Days before the scheduled hearing date, the bank submitted a "Motion for Judgment on Petition and to Dismiss Probate Matter" supported by a 19-page summation of the case. The bank also filed an extensive trial record. Due to illness, petitioners' counsel was unable to present a closing argument on the scheduled date. The trial court asked if counsel was willing to let the court decide the case based on the evidence, pleadings, and submissions. Counsel said, "[I]f that's the alternative, I would take that alternative, sir." Counsel asked, however, that the court dismiss the bank's motion but use the trial record to decide the matter. The court noted it had not granted the bank leave to file anything, and so it would take the bank's motion as a written final argument, and as nothing more.

¶ 46                                           D. Trial Court Ruling

¶ 47       Two judges entered substantive orders in this case—Judge Gerts and Judge Nicholson. Judge Gerts presided over the trial and issued a written decision on the petition to remove. In June 2021, Judge Gerts found petitioners had failed to produce evidence of any intentional or negligent acts of the bank that harmed the trust. In particular, he found petitioners had failed to prove the bank breached its duty to the trust by selling the S&S building for $91,200 or by selling the S&S equipment for $36,800. He similarly found no breach of duty in the bank's failure to sell S&S's NOL, noting Pakter's testimony was more convincing than Kinnan's testimony. Accordingly, he denied the petition to remove.

12

¶ 48        In July 2021, Judge Gerts retired from the bench, and petitioners moved to reconsider. The motion to reconsider went beyond the issues framed by Judge Gerts's decision and complained of petitioners' inability to present a closing argument.

¶ 49        In March 2023, Judge Nicholson denied the motion to reconsider. Although she did not address petitioners' specific contentions, Judge Nicholson indicated she reviewed the trial record and considered the parties' arguments and that she found Judge Gerts did not err in applying the law.

¶ 50        This appeal followed.

¶ 51                                II. ANALYSIS

¶ 52                                A. Jurisdiction

¶ 53        Although neither party raises a jurisdictional challenge, we have an independent duty to consider our jurisdiction. *Ontiveroz v. Khokhar*, 2025 IL 130316, ¶ 1. Petitioners' notice of appeal invokes Illinois Supreme Court Rule 301 (eff. Feb. 1, 1994), which provides that "[e]very final judgment of a circuit court in a civil case is appealable as of right." Rule 301, however, does not state that all final judgments are *immediately* appealable. Here, the trial court entered a final judgment only as to count III of the petition to remove. The early dismissal of counts I and II was without prejudice, and no final judgment was later entered on counts I and II. When a judgment is entered on only part of a dispute or as to less than all the parties, the judgment can only be immediately appealed under Rule 304's provisions. Ill. S. Ct. R. 304 (eff. Mar. 8, 2016); see *In re Marriage of Duggan*, 376 Ill. App. 3d 725, 735 (2007) ("Rule 304(a) adds a qualification to Rule 301, at least as to the timing of appeals from certain final judgments."). Rule 304(b)(1) states an immediate appeal may be taken from judgments "entered in the administration of an estate, guardianship, or similar proceeding which finally determines a right or status of a party." Ill. S.

13

Ct. R. 304(b)(1) (eff. Mar. 8, 2016). Here, the trial court denied a petition to remove a trustee of a decedent's trust. Such a judgment qualifies for immediate appealability under Rule 304(b)(1). Petitioners' citation to the wrong rule does not deprive us of jurisdiction. *O'Banner v. McDonald's Corp.*, 173 Ill. 2d 208, 211 (1996) (the notice of appeal's invocation of the wrong rule was a "mistake *** of no consequence"). Thus, we have jurisdiction to hear this appeal.

¶ 54                               B. One-Sided Closing Argument

¶ 55      Before proceeding further, we are compelled to confront an error that shapes the case before us. After the close of evidence, the trial court did not hear a final argument from petitioners yet chose to accept the bank's "Motion for Judgment on Petition and to Dismiss Probate Matter" as the bank's final argument. "Illinois follows those jurisdictions which hold that oral argument in a civil proceeding tried before the court without a jury, is a privilege, not a right, which is *accorded to the parties* by the court in its discretion." (Emphasis added and internal quotation marks omitted.) *Korbelik v. Staschke*, 232 Ill. App. 3d 114, 118-19 (1992). Here, the trial court accorded the privilege of a closing argument to one party but not the other. The record indicates petitioners' counsel had a legitimate excuse for his inability to proceed with oral argument on the appointed date. In light of this, and given the case's complexity and the trial's protracted and disjointed course, the court abused its discretion by considering the bank's written submission without allowing petitioners to submit their own argument.

¶ 56      A trial judge's desire to dispose of a complex case before his retirement date is commendable. However, such a desire must not overcome the age-old judicial imperative *audi alteram partem* ("hear the other side"). See *Blain v. Shaffner*, 37 Ill. App. 394, 395 (1890) (*audi alteram partem* is the first principle in the administration of justice). By considering only the bank's closing argument, the trial court limited itself to the bank's framing of the case. See *People*

14

*v. Givens*, 237 Ill. 2d 311, 323 (2010) (courts rely on the parties to frame the issues for decision). And by allowing only one party to frame the case, the court deprived petitioners of an equal opportunity to be heard. To ignore an error so egregious would impair public confidence in the judicial process.

¶ 57     With only one party's framing before it, the trial court issued a written decision that was strikingly incomplete. The decision reduced the case, which involved four years of discovery and trial testimony, to two potential grounds for trustee removal: (1) the allegedly undervalued sale of S&S's primary building and equipment and (2) the failure to sell S&S by leveraging its NOL. In so doing, the decision failed to address nearly every issue raised by the petition to remove. Petitioners' motion to reconsider attempted to frame the issues for the court. By then, however, it was too late. Judge Gerts had retired, and Judge Nicholson's ruling did not account for—and thus did not cure—the incomplete treatment of the case or petitioners' inability to present a closing argument.

¶ 58     On appeal, petitioners resubmit the contentions raised in their motion to reconsider and in their reply to that motion. Several of those contentions go beyond the issues addressed in the trial court's written decision. Historically, the appellate court was barred from considering issues not decided by the trial court. See Ill. Const. 1870, art. VI, § 11; *Scott v. Freeport Motor Casualty Co.*, 379 Ill. 155, 162 (1942) ("Under the constitution, Appellate Courts have no original jurisdiction; their jurisdiction is appellate only."); *Goodrich v. Sprague*, 376 Ill. 80, 86 (1941) ("[T]he Appellate Court's jurisdiction is appellate, and extends only to those matters in controversy which have been ruled upon by the trial court."). The 1970 constitution, however, moved beyond that strictly appellate model, conferring original jurisdiction on the appellate court when necessary to completely determine any case on appeal. Ill. Const. 1970, art. VI, § 6.

15

¶ 59    The 1970 constitution's court-related provisions took effect on July 1, 1971. Since then, the appellate court has recognized its limited authority to address issues not decided at the trial court level. See, *e.g.*, *Shortridge v. Sherman*, 84 Ill. App. 3d 981, 986 (1980) (considering question of law not passed on by the trial court); *In re Marriage of Bennett*, 225 Ill. App. 3d 828, 830-31 (1992) (considering question of fact not passed on by the trial court). Nevertheless, even after the 1970 constitution took effect, some appellate court decisions continued to rely on the older constitutional framework to decline reviewing issues not addressed by the trial court. See, *e.g.*, *Board of Education of Chicago v. Chicago Teachers Union, Local 1*, 26 Ill. App. 3d 806, 813-814 (1975) (citing *Sprague*, 376 Ill. at 86). Given the shift in constitutional framework, reliance on pre-1971 case law is misplaced and cannot control our jurisdictional analysis.

¶ 60    That said, our review remains grounded in principles of appellate restraint, and we typically decline to address issues not passed on by the trial court. See *In re Marriage of Bennett*, 225 Ill. App. 3d at 830. However, this is not a typical case. Given the one-sided nature of closing arguments (which directly contributed to the trial court's incomplete treatment of the case), the voluminous trial record, the trial judge's retirement, and petitioners' loss of their longstanding counsel mid-appeal,[1] a remand for a complete resolution of all issues would result in needless delay, cause the parties to incur unnecessary costs, and waste judicial resources. Moreover, petitioners' contentions on appeal were litigated at trial and argued in posttrial briefing, and we may consider issues likely to recur on remand to expedite the ultimate termination of the litigation. *Pielet v. Pielet*, 2012 IL 112064, ¶ 56.

---

[1]Petitioners' counsel died after filing his opening brief before this court.

16

¶ 61    Notably, with Judge Gerts's retirement, the trial testimony is simply documentary evidence that we and any trial judge are equally situated to review. "To require a trial court to reconsider the record and to make conclusions which would only return to this court which has already spent large amounts of time in digesting that record would be an extremely unwise use of judicial time and effort." *Citizens for a Better Environment v. Illinois Commerce Comm'n*, 103 Ill. App. 3d 133, 137 (1981). Thus, in the interest of judicial economy and pursuant to our constitutional authority, we consider the issues briefed on appeal.

¶ 62    Petitioners maintain the trial court erred in denying their petition to remove the bank as trustee. They argue the trial evidence demonstrated the bank breached its fiduciary duty in managing and selling the trust's assets. We review a court's decision after a bench trial under the manifest-weight standard. *Gambino v. Boulevard Mortgage Corp.*, 398 Ill. App. 3d 21, 51 (2009); see *Durdle v. Durdle*, 141 Ill. App. 3d 12, 15 (1986) (a court's finding that a trustee exercised requisite degree of care will not be disturbed unless it is against the manifest weight of the evidence). "A judgment is not against the manifest weight of the evidence unless the opposite conclusion is clearly evident." *Gambino*, 398 Ill. App. 3d at 51.

¶ 63    "A court of equity has inherent powers to remove a trustee for breach of trust, misconduct, or disregard of his fiduciary duties." *Laubner v. JP Morgan Chase Bank, N.A.*, 386 Ill. App. 3d 457, 467 (2008). However, "not every instance of mistake or neglect on the trustee's part justifies removal of the trustee; only if the trustee endangers the trust fund and removal is clearly necessary to save the trust should a court remove a trustee." *Durdle*, 141 Ill. App. 3d at 15. "A prayer for a trustee's removal is addressed to the sound discretion of the court and will not be disturbed on review except for an abuse of that discretion." *Brown v. Brown*, 62 Ill. App. 3d 328, 336 (1978).

¶ 64                                    C. Issues on Appeal

¶ 65      Petitioners argue they established at trial that the bank had breached its fiduciary duty by (1) selling trust property without listing it for sale, obtaining appraisals, or notifying petitioners; (2) paying all S&S accounts payable without proof that the liabilities it paid were just, owing, or correct, while refusing to pay any of the shareholder-creditors; (3) "plugging" its client's balance sheet by $50,500 to disguise its negligent accounting practices; (4) failing to record a $68,000 liability to the trust beneficiaries; (5) failing to disclose to the beneficiaries, before accepting trusteeship, an outstanding $50,000 loan it was owed by S&S; (6) keeping S&S in existence for two years after it had become inoperative and insolvent, to continue charging trust fees; (7) filing a U.S. income tax return showing a $141,466 net loss but failing to notify the siblings of the deductibility of this loss on their personal income tax returns; (8) charging the trust over $100,000 in attorney fees to conceal its own negligence; and (9) failing to realize S&S's NOL was a substantial asset that could be sold with other assets.[2]

¶ 66      We note the petition to remove does not allege every contention listed above. In particular, contentions (2), (3), (6), (7), (8), and (9) were not specifically alleged in the petition. We also recognize the bank continued to administer the trust after the petition's filing, the parties conducted extensive discovery after the petition's filing, and the unpleaded contentions reflect the issues testified to at trial.

¶ 67      The reviewing court is "authorized to amend the pleadings of a case on its own motion if necessary to conform the pleadings to the proof." *Pickett v. First American Savings & Loan Ass'n*, 90 Ill. App. 3d 245, 249-50 (1980); Ill. S. Ct. R. 362(f) (eff. July 1, 2017); Ill. S. Ct. R. 366(a)(1)

---

[2]Petitioners retained new counsel after filing their opening brief in this court. Following the change in representation, petitioners submitted arguments in their reply brief that were not raised in their opening brief. Those arguments are forfeited and will not be considered. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) ("Points not argued [in the opening brief] are forfeited and shall not be raised in the reply brief ***.").

(eff. Feb. 1, 1994). "To the end that justice may be done, courts are liberal in the allowance of amendments conforming the pleadings to the proof, but their materiality to the evidence already introduced must be apparent." *McCartney v. McCartney*, 8 Ill. 2d 494, 497 (1956). Courts will also consider whether the responding party would be prejudiced by the amendment. See *Luciani v. Bestor*, 106 Ill. App. 3d 878, 889 (1982).

¶ 68        Here, every unpleaded issue raised on appeal was litigated in the trial court. In fact, the court ruled on at least two unpleaded issues. It rejected petitioners' shareholder loan argument as meritless and found the bank's failure to pursue a NOL sale was not a breach of fiduciary duty. (The court rejected the shareholder loan argument during trial and did not revisit the issue in its written decision.) The petition to remove did not raise either of these issues. Additionally, while the petition alleged the sale of S&S's primary building and equipment was still pending and did not specify a sale price, the written decision considered trial evidence indicating the sale had been executed and found the eventual sale price did not render the bank's conduct a breach of fiduciary duty. By doing so, the written decision necessarily construed the building-and-equipment-sale allegation as reflecting evidence adduced at trial. In short, the court was operating as though the petition had been updated to reflect the trial evidence.

¶ 69        We acknowledge the bank never brought the pleadings issue to *any court's* attention and, by vacating the court's decision based on an unbriefed, nonjurisdictional issue, we would be creating unnecessary steps for the trial court and the parties on remand. See 735 ILCS 5/2-616(c) (West 2022) ("A pleading may be amended at any time, before *or after judgment*, to conform the pleadings to the proofs, upon terms as to costs and continuance that may be just." (Emphasis added.)); see also Ill. S. Ct. R. 366(a)(1) (eff. Feb. 1, 1994) ("In all appeals the reviewing court may, in its discretion, and on such terms as it deems just, *** exercise all or any of the powers of

amendment of the trial court \*\*\*."). Therefore, in the interest of justice, and pursuant to our authority under Rules 362(f) and 366(a)(1), we amend the petition to conform the pleadings to the proof.

¶ 70    We now address the issues in turn.

¶ 71    D. Sale of Real Property and Equipment

¶ 72    First, petitioners argue the bank breached its fiduciary duty by selling trust property without listing it for sale or obtaining appraisals, and without notice to petitioners. They note that a licensed appraiser, Anderson, valued S&S's primary building at $350,000 after decedent's wife died and at $165,000 after decedent died, yet the bank sold the building for only $91,200. Before selling the building, however, the bank relied on the opinions of two local commercial real estate brokers—Nugent and Bennett.

¶ 73    Nugent critiqued Anderson's $165,000 appraisal and opined in June 2016 that $100,000 was a more appropriate valuation given local market conditions, residential zoning, and functional obsolescence even for industrial use. In his letter to Bruhn, Nugent stressed that the $100,000 value does not account for any environmental concerns that could negatively affect the property value. As for Bennett, he informed Bruhn in April 2016, "The assessor seemingly has the property valued at $100,000. While we could market the property and search for a buyer, I would think if you have an interested cash buyer that could close quickly, you should strongly consider that option." Bruhn testified that although the trust committee considered Anderson's $165,000 appraisal, it also noted his appraisal was based on "comparable sales" outside Kankakee County, the assessor valued the property at $101,000, the building had annual carrying costs of over $15,000, and the real estate brokers based their opinions on comparables in the Kankakee area. In light of these considerations, we cannot say the bank breached its fiduciary duty by selling the S&S building for $92,000.

¶ 74    Petitioners also argue the bank breached its duty by selling S&S equipment for $36,800 without appraisals or attempts to market the equipment. Bruhn testified she relied on Richard Sippel for the equipment's valuation and that she reached out to an auctioneer who opined about its value and communicated the cost to use the auctioneer's services. Petitioners fail to provide a basis to find the $36,800 sale an example of a breach of the bank's fiduciary duty. Nor do they present authority or reasoned argument to show that the failure to market and appraise an asset is a *per se* breach of fiduciary duty. Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020). Accordingly, we reject this argument.

¶ 75    Similarly, petitioners argue the bank breached its duty by selling a two-unit rental apartment building for $32,000 without appraising or marketing the property. Petitioners do not provide citations to the record for this statement, and we were unable to locate testimony supporting it. We reject this argument outright. Ill. S. Ct. R. 341(h)(6), (7) (eff. Oct. 1, 2020).

¶ 76                              E. Payment of S&S Liabilities

¶ 77                                1. *Debra's Records*

¶ 78    Petitioners argue the bank breached its fiduciary duty by paying all S&S accounts payable without proof that the liabilities it paid were just, owing, or correct, while refusing to pay any of the shareholder-creditors. According to them, no books or records existed for S&S when the bank took over trusteeship in March 2016, and the bank and Debra destroyed all S&S books and records. Further, the bank relied on a list of accounts payable provided by Debra, whom petitioners accuse of "stealing." The bank counters by noting that Harold had continuous access to S&S computer files, including its QuickBooks accounting software. He did not, however, file any inventory or attempt to update the inventory while the case was pending. Further, Harold could not identify any specific documents he believed were destroyed.

21

¶ 79      Where Debra was S&S's only bookkeeper, it is unrealistic to expect the bank to avoid relying on Debra's recordkeeping simply because the trust beneficiaries are in conflict. Under these circumstances, we cannot say the bank breached its fiduciary duty by relying on Debra's records.

¶ 80                                                    2. *Shareholder Loans*

¶ 81      Alternatively, petitioners argue the bank owes decedent's estate 51.67% of the $61,759 paid to creditors, because the shareholder loans ($118,180) represented 51.67% of S&S's total liabilities ($230,045).[3] Petitioners cite *Nonnast v. Northern Trust Co.*, 374 Ill. 248, 267 (1940), a case is directly on point. There, the decedent had advanced nearly $300,000 in cash to a furniture company he established, and in which he owned 95% of the stock. *Id.* at 267. His claims against the company represented 71% of its liabilities. *Id.* The trustee paid $47,253.22 to the company's outside creditors, and $1,600 to the decedent's estate. *Id.* The supreme court held the trustee "was derelict in its duty and grossly negligent in failing to collect for that estate its proportionate part [*i.e.*, 71%] of what was paid by the furniture company on its debts." *Id.*

¶ 82      The bank makes no attempt to counter this argument or to distinguish *Nonnast*. See Ill. S. Ct. R. 341(h)(7), (i) (eff. Oct. 1, 2020) ("Points not argued are forfeited ***.").

¶ 83      During trial, the court rejected petitioners' contention regarding the bank's failure to attempt repayment of the shareholder loans, stating, "[T]he creditors have first claim on the money, not the shareholders." The trial court appears to have invoked "one of the general principles of corporate and bankruptcy law: that creditors are entitled to be paid ahead of shareholders in the distribution of corporate assets." *In re American Wagering, Inc.*, 493 F.3d 1067, 1071 (9th Cir.

---

[3]Assuming the values for shareholder loans and total liabilities are accurate, the math is slightly off here. $118,180 is approximately 51.37% of $230,045.

22

2007). This general principle, however, does not compel the subordination of shareholder loans in all cases. Indeed, the federal statute born from this principle—section 510(b) of the Bankruptcy Code (11 U.S.C. § 510(b) (2018))—makes it clear that shareholder status alone is not enough to trigger subordination. "[I]n enacting § 510(b), Congress did not intend to subordinate every claim brought by a shareholder." *In re Telegroup, Inc.*, 281 F.3d 133, 144 n.2 (3d Cir. 2002). Subordination under section 510(b) requires a causal relationship between the shareholder's claim and the purchase or sale of stock. *Id.*; see 11 U.S.C. § 510(b) (mandatory subordination rule applies to claims "arising from rescission of a purchase or sale of a security").

¶ 84 Here, there was no concrete evidence that shareholder loans to S&S were causally related to the purchase or sale of S&S stock. In fact, there were only two longstanding shareholders: decedent and his wife. According to Debra, the shareholder loans of $168,680 reflected "money that [her] parents put in over the 40-some years that they took out of their savings account, their own personal money, and added into the company." There was no evidence her parents' ownership shares fluctuated with each loan disbursement to S&S such that the loans could be deemed "arising from rescission of a purchase or sale of a security." 11 U.S.C. § 510(b). Thus, assuming the applicability of bankruptcy law, the shareholder loans to S&S would not be subject to mandatory subordination.

¶ 85 Nor can the shareholder loans be *equitably* subordinated. Equitable subordination[4] requires, as a necessary condition, that "the creditor whose claim is to be subordinated must have engaged in some type of inequitable conduct in connection with the claim being asserted." *Paul H. Schwendener, Inc. v. Jupiter Electric Co.*, 358 Ill. App. 3d 65, 72 (2005); see *In re Kreisler*,

---

[4]Whereas section 510(b) of the Bankruptcy Code provides for mandatory subordination, section 510(c) provides for equitable subordination. See 11 U.S.C. § 510(b), (c) (2018).

546 F.3d 863, 865 (7th Cir. 2008) ("Equitable subordination is generally appropriate only if a creditor is guilty of misconduct that causes injury to the interests of other creditors."). The record lacks any evidence of inequitable conduct attributable to decedent and his wife in connection with their loans to S&S. Moreover, neither the trial court nor the bank has the power to apply equitable subordination principles to S&S's shareholder loans, as these principles are particular to bankruptcy law and can only be decided in a bankruptcy setting. *Jupiter Electric Co.*, 358 Ill. App. 3d at 72 ("Equitable subordination *** is distinctly a power of federal bankruptcy courts, as courts of equity, to subordinate the claims of one creditor to those of others." (Internal quotation marks omitted.)).

¶ 86    Nonetheless, we recognize S&S was undercapitalized in its final years. See *In re Lifschultz Fast Freight*, 132 F.3d 339, 345 (7th Cir. 1997) ("Under any definition, undercapitalization just means that a company does not have enough funds on its balance sheet or in the till. *** Most often undercapitalization signifies nothing more than business failure, poor access to capital, or both."). Pakter described S&S in its final years as "a distressed company whose revenues [were] not enough to cover its salaries and other overheads," and decedent "was putting money in every year to cover the company's losses." But undercapitalization does not establish shareholder-creditor misconduct. "[U]ndercapitalization alone, without evidence of deception about the debtor's financial condition or other misconduct, cannot justify equitable subordination of an insider's debt claim." *Id.* at 349; see *In re Fabricators, Inc.*, 926 F.2d 1458, 1469 (5th Cir. 1991) ("[U]ndercapitalization alone is an insufficient reason to use equitable subordination.").

¶ 87    In the same vein, we note the trial court did not find, nor did the bank determine, that the shareholder loans were improperly characterized as "loans." See generally *In re Airadigm Communications, Inc.*, 616 F.3d 642, 658 (7th Cir. 2010) (differentiating recharacterization actions

24

from equitable subordination actions). Ironically, the bank's expert, Pakter, took the position that the shareholder loans "were a debt, an owing that can never be replaced," while petitioners' expert, Kinnan, opined that the shareholder loans were not *bona fide* loans but an estate asset that should have gone into the trust. Either way, the fact remains that the bank was presented with a corporate tax return specifying shareholder loans yet made no attempt to satisfy those loans. The trust officer, moreover, offered inconsistent and uninformed testimony as to the bank's rationale for disregarding the shareholder loans. When first asked about the loans, Bruhn testified she could not answer because she did not know the shareholders' identities. Later, she testified the bank did not repay the loans because the shareholders were decedent and his wife, who "would just be paying themselves back." When asked if the bank's accountant had made the decision to not repay the shareholder loans, she could not answer. At one point, she testified the shareholder loans were written off, but when asked to explain what that meant, she acknowledged she did not know.

¶ 88      Taken together, Bruhn's testimony indicates the bank was aware the shareholder loans constituted liability, but it deemed the loans "written off" because the shareholders also happened to own S&S. In *Nonnast*, the supreme court found that a shareholder-creditor's estate was owed "its proportionate part of what was paid by the [shareholder-creditor's] furniture company on its debts." *Nonnast*, 374 Ill. at 267. Notably, the court was not swayed by the shareholder-creditor's status as the furniture company's founder, with a 95% stake in the company and with exclusive ownership of the company's primary building. *Id.* at 250. Nor was it swayed by the fact the estate executor knew the furniture company "was in desperate financial straits, had no cash on hand, had a pay-roll over due and had overdrawn at the bank." *Id.* at 258.

¶ 89      We are bound by *Nonnast*. Where the bank failed to secure the trust's rightful share of S&S's debt payments, "it was derelict in its duty and grossly negligent." *Id.* at 267. As a direct

result of the bank's negligence, the trust suffered damages equal to its share of the funds paid to the trade creditors. All the elements of a breach-of-fiduciary-duty claim are thus established. See *Lawlor v. North American Corp. of Illinois*, 2012 IL 112530, ¶ 69 (breach of fiduciary duty requires proof of (1) duty, (2) breach, and (3) proximate causation). The Illinois Trust Code grants trial courts broad equitable authority to remedy breaches of trust. See 760 ILCS 3/1001(b), (c) (West 2022). This authority includes the power to "compel the trustee to redress a breach of trust by paying money, restoring property, or other means." *Id.* § 1001(b)(3). Although we could remand for the trial court to exercise its equitable authority, *Nonnast* dictates the proper outcome. See *Nonnast*, 374 Ill. at 267 (the shareholder-creditor's proportionate share of what was paid on the company's debts is "chargeable" to the executor). Moreover, we may "enter any judgment and make any order that ought to have been given or made, and make any other and further orders and grant any relief." Ill. S. Ct. R. 366(a)(5) (eff. Feb. 1, 1994). Accordingly, we find the bank liable for the trust's proportionate share of the total amount paid to trade creditors. We remand to the trial court for a determination of the trust's proportionate share and the entry of a money judgment against the bank and in favor of the trust.

¶ 90    The bank's breach of its fiduciary duty does not, however, necessitate removing the bank as trustee. The power to remove a trustee is an extreme measure that "should be exercised sparingly and [only] upon a showing of clear necessity." (Internal quotation marks omitted.) *Brown*, 62 Ill. App. 3d at 336. We do not believe removal is a clear necessity based solely on the bank's neglect to pay off S&S's shareholder liabilities, particularly where the record does not indicate the bank acted against the trust's interest willfully. See *Waterman v. Alden*, 144 Ill. 90, 101-02 (1893) (court properly refused to remove trustee whose negligence caused partial loss of estate funds, where the

26

trustee's errors were not willful misconduct). Thus, while the bank's breach of trust warrants compensation, it does not clearly necessitate the bank's removal as trustee.

¶ 91                                    F. Tax Return Discrepancy

¶ 92        Petitioners argue S&S's final tax return has a $50,500 discrepancy due to the incompetent work attributable to both the bank and the accounting firm the bank hired to complete the corporate tax return. They note that the 2014 tax return indicates outstanding shareholder loans of $118,180 and the 2015 tax return indicates shareholder loans of $168,680, yet the bank did not identify the source of the $50,500 increase. Pakter testified this increase was attributable to money that decedent placed in S&S to cover its losses. He had no reason to doubt the accuracy of the tax return prepared by an accountant at the direction of the taxpayer, particularly when decedent had been "putting money in every year to cover the company's losses" and there were "no other means of funding this company other than the shareholders putting in money to keep it afloat." Without more, petitioners' argument is mere speculation. We reject it as such.

¶ 93                                    G. Failure to Record Loan

¶ 94        Petitioners argue the bank failed to record a liability to the siblings for a $68,000 loan the siblings had made to S&S. In 2008, the bank extended to Debra a $68,000 line of credit, which was collateralized by rental property owned by the siblings. According to petitioners, Debra allegedly transferred the proceeds to S&S but never accounted for this money in the company's books. Petitioners argue that, despite being apprised of this loan, the bank failed to record it as a payable to the siblings.

¶ 95        Petitioners' contention lacks evidentiary basis. Bruhn testified she was unaware of a line of credit collateralized by the siblings' rental property. Debra testified she and her three brothers took out a line of credit in 2008 secured by their rental property and transferred money from the

27

Sippel Rentals account into the S&S account to pay for her brothers' union pension. She recorded the money as a "deposit," not a loan. According to her, the money "was not a loan to S&S because [her] parents were already drained with loans." Rather, "it was a gift to keep [S&S] open. And it went to [her brothers'] union." Petitioners produced no evidence to prove otherwise. What is more, petitioners' own counsel appeared uncertain during trial about the loan's existence. Referring to a line of credit collateralized by the siblings' rental property, petitioners' counsel stated at one point that Debra "supposedly" lent the funds to S&S and, at another point, that the funds were "allegedly" linked to S&S. Compounding matters still, counsel assigned different values to this alleged loan: $67,000, $76,000, $68,000, and $69,000. Without evidence of an alleged loan, the bank could not record a liability. Thus, we reject petitioners' contention.

¶ 96                          H. Failure to Disclose Conflict of Interest

¶ 97        Petitioners argue the bank breached its fiduciary duty by failing to disclose to the beneficiaries, before accepting trusteeship, an outstanding $50,000 loan it was owed by S&S. In 2006, S&S took out a $50,000 commercial line of credit at the bank. The line of credit was secured by S&S's primary building, which was owned by decedent. According to petitioners, the bank failed to disclose its conflict to *all* the siblings before accepting trusteeship and "got itself appointed as trustee" to collect its $50,000 loan to S&S, which it successfully accomplished eight months after assuming trusteeship.

¶ 98        "[A] trustee may not engage in any form of self-dealing with the trust [citation] or place himself in a position where his interests conflict with those of the trust beneficiaries." *In re Estate of Hawley*, 183 Ill. App. 3d 107, 109 (1989). The bank argues it did not act "surreptitiously" and only accepted the trusteeship on the request of all the beneficiaries, who collectively appointed the bank as successor trustee. Notably, two of the beneficiaries and LaBeau, the attorney for

28

decedent's trust, were aware of the bank's conflict before the bank accepted trusteeship; Debra personally apprised the bank of its creditor status; and the bank's outstanding mortgage was presumably a matter of public record. In light of the bank's heightened duty of undivided loyalty, however, these considerations do not relieve the bank of its obligations to the trust beneficiaries. See *Laubner*, 386 Ill. App. 3d at 464 ("[T]he trustee must act honestly and with undivided loyalty to the trust, not merely with the standard of the workaday world but with the most sensitive degree of honor."). Irrespective of its good or bad faith (see *id.*), the bank should not have accepted trusteeship before disclosing its creditor status to all of the siblings.

¶ 99 Nevertheless, assuming the bank's breach has been established, petitioners failed to show causation as required for a breach-of-fiduciary-duty claim. *Daily v. Greensfelder, Hemker & Gale, P.C.*, 2018 IL App (5th) 150384, ¶ 31 ("An essential element of a claim for breach of fiduciary duty is damages proximately caused by the breach."). The record reveals no compelling evidence that the bank's conflict of interest jeopardized the trust assets or that the bank improperly gave preference to its own loan. The bank's loan was a secured loan, collateralized by S&S's primary building, and dating back to 2006. Further, Bruhn testified the primary building's mortgage had to be paid off so it could be sold with clear title. Under these circumstances, we do not believe petitioners established a breach of fiduciary duty.

¶ 100                                    I. Failure to File Bankruptcy

¶ 101 Petitioners argue the bank kept S&S in existence for two years after it had become inoperative and insolvent to continue charging trust fees. According to petitioners, declaring bankruptcy for S&S would have been "the most beneficial action" for petitioners, but the "worst thing" for the bank, because bankruptcy "could have cost the bank to lose most of its $50,000

29

mortgage loan." We reject petitioners' contention as speculative and not based in reasoned argument or authority. Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020).

¶ 102    Bruhn's testimony indicated bankruptcy was unnecessary. She testified the bank was able to pay off creditors using money from the sale of S&S's assets. Moreover, Debra's testimony revealed her parents would have been averse to bankruptcy: "Our parents would never, never go into bankruptcy. They were very proud people to pay their bills." We do not believe the bank breached its fiduciary duty by choosing to pay off S&S's creditors.

¶ 103    J. Failure to Notify Siblings of Tax Benefit and Attorney Fee Charges

¶ 104    Petitioners argue the bank breached its fiduciary duty by (1) failing to notify the siblings of the deductibility of a $141,466 net loss on their personal income tax returns and (2) charging the trust over $100,000 in attorney fees "to conceal its own negligence." Petitioners forfeit these arguments by failing to provide reasoned argument or citation to authority. *Id.*

¶ 105    K. Tax Value of Net Operating Loss

¶ 106    Petitioners argue the bank failed to "realize that [S&S's NOL] was a substantial asset that could be sold with the other assets." Petitioners' expert witness, Kinnan, opined that S&S's ending NOL could have been sold with the business or property and had a combined value of around $60,000 or $90,000 (depending on the future corporate tax rate) for federal and state tax purposes. The bank's expert witness, Pakter, opined that S&S was not an attractive purchase and the NOL was worthless. The trial court found Pakter's testimony "far more convincing than Mr. Kinnan['s]." Pakter noted that Kinnan's opinion is "all good hypothetical speculation that might make a good classroom case study, but it's not workable in the real world." We find Pakter's opinion provided the trial court with sufficient basis to reject petitioners' contention.

¶ 107    III. CONCLUSION

¶ 108    In reliance on *Nonnast*, we remand for the computation and entry of a money judgment against the bank. We further hold the trial court's denial of the petition to remove was not an abuse of discretion, and therefore, we affirm the court's judgment.

¶ 109    Affirmed and remanded with directions.

¶ 110    JUSTICE PETERSON, concurring in part and dissenting in part:

¶ 111    I concur with the majority and its analysis of three issues. I agree that the trial court's conclusions—that the bank did not breach its fiduciary duty (1) by selling the S&S building for $91,200, (2) by selling the equipment for $36,800, or (3) by failing to sell S&S for the value of its net operating loss—were not against the manifest weight of the evidence. Those were "the issues of the case" according to the trial court in its written judgment order and the only issues that the trial court made factual findings and rulings on in its judgment order.

¶ 112    However, I cannot join the majority on the various other issues being decided for the first time by this court on appellate review and, therefore, respectfully dissent from the majority's decision on those issues. "Courts of review function to review rulings and judgments of the circuit courts and generally will not pass upon any question as to which the circuit court failed to make a decision." *In re Marriage of Bennett*, 225 Ill. App. 3d 828, 830 (1992); see *Shortridge v. Sherman*, 84 Ill. App. 3d 981, 986 (1980) (recognizing that any question not reached at the trial level is normally remanded for consideration); *Board of Education of Chicago v. Chicago Teachers Union, Local 1*, 26 Ill. App. 3d 806, 813 (1975) (indicating that the appellate court's function is to review the rulings, orders, or judgments of the trial court and that the appellate court will not consider issues that the trial court has refused to decide, unless the appellate court is asked to decide whether the trial court's refusal to act was an abuse of judicial discretion); *Somerset House, Inc. v. Board of Appeals of Chicago*, 131 Ill. App. 2d 569, 572 (1970) (stating that reviewing courts

31

are obviously intended to review matters upon which rulings have already been made and indicating that it would be improper for a reviewing court to consider an issue unless the parties had an opportunity to litigate that issue in the trial court and the trial court had made a decision on that issue). In limited circumstances, a reviewing court may, for the purpose of judicial economy and pursuant to Illinois Supreme Court Rule 366(a)(4), (5) (eff. Feb. 1, 1994), resolve an undecided issue rather than remand that issue for the trial court to decide. See *Bennett*, 225 Ill. App. 3d at 830-31. That exception to the general rule is a narrow one and should not be broadly expanded as the majority does in the case at bar.

¶ 113     In the present case, the majority rules on six issues that the trial court made no findings of fact or rulings of law on in its written judgment order.[5] The parties litigated those issues below (and petitioners briefed those issues in this appeal), but the trial court, either by mistake or by choice, did not rule upon those issues. I would rule that this court of review should not decide issues that were not decided by the trial court when those issues constitute the majority of the issues raised in the case. Indeed, the issue that the majority remands[6] upon in this case—the bank's handling of the shareholder loans—was neither framed in the operative pleading[7] (petition to remove) nor ruled upon in the trial court's written judgment order.

---

[5]The majority also determines that the trial court abused its discretion by considering the bank's written submission (the motion that the bank had filed) as the bank's closing argument without allowing petitioners to submit their own closing argument. I would rule, however, that any error that resulted from the trial court doing so was cured when the petitioners filed a motion to reconsider and raised all of the grounds upon which they were seeking to remove the bank as trustee. The motion to reconsider was fully briefed and fully litigated in the trial court.

[6]The majority remands to the trial court for further proceedings on this issue without reversing because the trial court did not rule on the issue and, thus, cannot be reversed.

[7]The pleading raised the following issues: (1) whether the bank destroyed (or allowed to be destroyed) S&S's financial records, (2) whether the bank had a conflict of interest with the beneficiaries because the bank had an existing $50,000 loan to S&S that was secured by the building, (3) whether the bank had a conflict of interest with the beneficiaries because of a $68,000 line of credit that was established by Debra Kroll with the proceeds being loaned to S&S, and (4) whether the bank was biased in favor of

32

¶ 114    The cause of action in this case is a petition to remove the bank as trustee for alleged breaches of fiduciary duty to the trust. The trial court entered the judgment denying the petition to remove based on only three issues, yet six allegations of breach were litigated and argued but not ruled upon. Thus, the trial court's order should be vacated and this cause remanded for findings and rulings on those issues.

---

Debra Kroll and Richard Sippel, who had "stripped most of the assets from decedent's estate," (5) whether the bank was negligent in its sale of the building and equipment, and (6) whether the bank was negligent in its sale of a boat, two company trucks, and a van. The trial court only ruled on the fifth issue in its judgment order.

*In re Estate of Sippel*, 2025 IL App (3d) 230227

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Kankakee County, No. 16-P-250; the Hon. Ronald J. Gerts and the Hon. Nancy A. Nicholson, Judges, presiding. |
| **Attorneys for Appellant:** | Gregory B. Jumbeck, Mikal J. Stole, and Dinah Archambeault, of Reich, Jumbeck, Stole & Reeb, L.L.P., of Joliet, for appellants. |
| **Attorneys for Appellee:** | Michael A. Clarke, of Anthony Bruozas & Associates, P.C., of Bourbonnais, for appellee. |